## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-CR-138-009-CVE |
| | ) | |
| ERLIN AYALA, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Now before the Court is defendant's Motion to Suppress Evidence (Dkt. # 225). Defendant argues that a drug-sniffing dog's nose crossed the threshold of a vehicle window before completing a sniff of exterior of the vehicle and argues that the evidence suggests that police, not the defendant, may have rolled a window down to increase the likelihood that the dog would alert to the presence of drugs. The government responds that police had reasonable suspicion to conduct a traffic stop and the free air dog sniff of defendant's vehicle did not violate the Fourth Amendment. The Court held an evidentiary hearing on defendant's motion to suppress on June 17, 2010.

### I.

On October 5, 2009, police were conducting surveillance on a possible drug transaction at a Shell gas station at East 31st Street and Memorial Drive in Tulsa, Oklahoma. Agents had learned via wiretap about a meeting between Ruben Garcia, the target of the investigation, and Erlin Ayala. The meeting took place at approximately 6:45 p.m., and agents observed a possible drug sale in the parking lot of the Shell station. Garcia left the Shell station in his vehicle, and Ayala drove away in a white Toyota Scion heading north on Memorial Drive. Oscar Montoya was a passenger in Ayala's vehicle. Tulsa Police Department (TPD) Officer Anthony First was on patrol and was

advised to be on the lookout for a white Toyota Scion.  First saw the vehicle near the 2100 block of

Memorial Drive, and began to follow it.  The vehicle entered onto Interstate 244 (I-244) from

Memorial Drive, and First continued to follow the vehicle.

First testified that the vehicle entered the inner (left) lane heading westbound on I-244.  He

observed the vehicle drift right about halfway into the middle lane without using a turn signal, and

the vehicle moved back into the inner lane before it completed a lane change.  First testified that this

was a violation of a City of Tulsa municipal ordinance (unsafe lane change) and provided a basis

to conduct a traffic stop.  However, he did not initiate a traffic stop for about a mile because he was

looking for a safe place to conduct a traffic stop on I-244.  First activated his patrol car's emergency

lights, and the vehicle pulled onto the shoulder of I-244.  In response to questioning by defense

counsel, First acknowledged that he was looking for a reason to initiate a traffic stop, but testified

that he did observe a traffic violation before the traffic stop occurred.  First testified that it was there

was light rain or drizzle on his windshield.

First approached the passenger side of the vehicle and attempted to make contact with the

occupants of the vehicle.  He testified that he approached the passenger side for officer safety and

this was not unusual.[1]  The passenger side window was partially rolled down and First smelled a

strong odor of perfume or air freshener coming from the interior of the vehicle.  He made a mental

note of the smell, because this type of odor is sometimes used to mask the presence of illegal drugs.

First testified that there were two men in the vehicle, but neither person initially noticed that First

had approached the passenger side of the vehicle.  It appeared to First that the men were searching

---

[1]     First testified that he approached the passenger side due to the volume of traffic on I-244 and
        to surprise the occupants in case the driver was attempting to reach a weapon in anticipation
        of an approaching police officer.

2

for something in the vehicle, and First observed that both men were nervous.  After a short time, both men made eye contact with First.  First asked the driver, Ayala, for identification and proof of insurance.  Ayala stated that he had a Mexican identification card, but he did not have proof of ownership or insurance.  The passenger, Montoya handed First a yellow post-it note with a phone number, even though First did not ask for the post-it note.  First asked Ayala who owned the vehicle, and Ayala stated that the vehicle belonged to his girlfriend "Melissa."

First asked Ayala to come to First's patrol car while First ran a record check on the vehicle, and Ayala agreed.  First ran a record check on a computer in his patrol car, but the search did not locate any local criminal record for either Ayala or Montoya.  First called dispatch, and asked the dispatcher to run a records check as well.  The white Toyata Scion that Ayala was driving had an Arkansas license plate, but neither Ayala nor Montoya was from Arkansas or had an Arkansas identification card.  First returned to the vehicle to check the NADAR sticker on the inside of the driver side door of the vehicle.  The NADAR sticker lists the vehicle's manufacturer, date of manufacture, and  Vehicle Identification Number, and this information would help First identify the owner of the vehicle.  First checked the NADAR sticker and he observed a Nebraska identification card for "Carlos Lopez" on the floorboard.  After First wrote down the information from the NADAR sticker, he asked Montoya about his travel plans.  Montoya stated that he was visiting a friend in Tulsa, but he could not remember the friend's name and did not know exactly where the friend lived.  Montoya pointed toward the vicinity of East 21st Street and Memorial Drive, but First noted that the vehicle had been driving away from that area at the time of the traffic stop.  Montoya stated that he thought the vehicle belonged to a friend of Ayala's named "Isabero."

First returned to his patrol car and asked Ayala about the purpose of his visit to Tulsa. Ayala stated that he lived in Oklahoma City, but was looking for work as a house painter in Tulsa. First had not seen any painting equipment in the vehicle. First also asked Ayala about the Nebraska identification card on the floorboard of the vehicle. Ayala said that it was his cousin's identification card, but did not explain why the card was in the vehicle. Before the traffic stop, First had been informed that a police unit with a drug dog was on call. Considering a combination of factors, he determined that it would be appropriate to request assistance from the canine unit. He testified that the occupants' nervousness, the smell of perfume or air freshener, conflicting stories about the ownership of the vehicle and the occupant's travel plans, and the lack of means of verification of the ownership of the vehicle or the identity of the occupants were all factors that he considered.

First called for a drug dog to come to the location. The canine unit consisted of Detective Daryl Johnson and his dog Max. Johnson had been Max's handler since 2006, but Max had been serving as a canine partner for TPD since 2003. Johnson had performed over 600 deployments with Max, and in Max's most recent testing his accuracy rate for detecting the presence of illegal drugs was 89.2 percent. About an hour or two before the traffic stop, TPD Officer Wilcoxen had asked Johnson and Max to remain on call near East 41st Street and Memorial Drive, and it took Johnson about eight minutes to arrive at the scene of the traffic stop after receiving First's call. Johnson led Max to the vehicle to begin a free air dog sniff. Johnson testified that he followed his standard practice of starting the dog sniff at the passenger side headlight and walking Max counterclockwise around the vehicle. Due to the high volume of traffic on I-244, Johnson anticipated that he would have to lead Max around the vehicle about four or five times, because traffic tended to distract Max during a sniff.

During the first walk around the vehicle, Max focused on a seatbelt sticking out of the passenger side door.[2] Max became distracted and began walking around the vehicle a second time. Max focused on the trunk, but again became distracted and continued to walk around the vehicle in a counterclockwise direction.  On the third time walking around the vehicle, Max focused on the open driver side window, he arched his neck, and his nose crossed the window threshold.  However, he did not alert to the presence of drugs.  Instead, Max initiated a clockwise walk around the vehicle and, about 15 to 25 seconds later, stopped at the passenger side door.  Max sat down next to the passenger side door, and alerted Johnson that he detected the scent of illegal drugs.

Johnson informed First about the canine alert, and First conducted a vehicle search based on the Max's response.  Johnson served as the property recovery officer during the search.  First found a cell phone near a map of Oklahoma and a business card for Boost Mobile.  First testified that Boost Mobile phones are disposable cellular phones that are frequently used by drug traffickers.  In the back seat, First found a duffel bag with clothing and toiletries, a cellular phone with the battery removed,[3] and a rolled tube of cellophane.  On the back floorboard, First saw a brown grocery bag and he found a Rubbermaid container in the bag.  He opened the container and found a crystalline substance wrapped in cellophane.  Johnson field-tested the substance, and confirmed that the substance contained methamphetamine.  First found two bottles of cologne in the glove

---

[2]     Johnson distinguished between "focusing" and "alerting" during his testimony.  As a passive alert dog, Max would "alert" Johnson to the presence of drugs by sitting outside the vehicle. Johnson used the term "focusing" when Max stopped to pay particular attention to a scent, but did not actually "alert" Johnson that he smelled illegal drugs.

[3]     First testified that, based on his training and experience, he was aware that drug dealers would remove the batteries from cellular phones, because the drug dealers believed that this would prevent police using a global positioning system to track their movements.

compartment.  Ayala had two other cellular phones on his person.  Police arrested Ayala and Montoya at the scene of the traffic stop.  Ayala was booked for traffic violations and transporting illegal drugs, and Montoya was booked on a drug charge only.

## II.

Defendant argues that the evidence does not clearly establish that defendant rolled down the driver side window before the dog sniff, and this suggests that police may have rolled down the window to aid the drug dog during a free air sniff.  At the evidentiary hearing, defendant clarified that it is this factual inconsistency, rather than the mere fact that the drug dog's nose crossed the window threshold, that forms the basis for his motion to suppress.  The government responds police had reasonable suspicion to extend the length of the traffic stop and the free air dog sniff did not violate defendant's Fourth Amendment rights.

A traffic stop is treated as an investigative detention, and such a stop is governed by the standards set forth in Terry v. Ohio, 392 U.S. 1 (1968).  United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005).  When determining the reasonableness of a traffic stop, a court must make two separate inquiries.  First, did the police officer have a valid reason for initiating the traffic stop. United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995).  "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."  Id.  Second, a traffic stop must not become an unnecessarily lengthy detention, but must be limited in scope to the purpose of the initial traffic stop.  United States v. Rice, 483 F.3d 1079, 1083 (10th Cir. 2007).  A police officer may extend the length of the traffic stop for questioning beyond the initial purpose of the traffic stop only if the officer has "an objectively reasonable and

articulable suspicion that illegal activity has occurred, or the driver voluntarily consents to further questioning." United States v. Ramirez, 479 F.3d 1229, 1243 (10th Cir. 2007).

First testified that he observed Ayala's vehicle drift into another lane without using a turn signal, and this traffic violation (unsafe lane change) was the basis for the traffic stop. The Court finds that First's testimony on this point was credible. First recalled specific details about the vehicle, including the vehicle's license plate number, and the traffic violation, and defendant presented no evidence contradicting First's version of the events leading up to the traffic stop. Defendant argues that the "traffic offense was used as a pretext to stop the defendant." Dkt. # 225, at 3. However, the subjective intentions of the police are irrelevant under the Fourth Amendment, and it does not matter if police had another purpose for initiating a traffic stop. Whren v. United States, 517 U.S. 806, 813 (1996); Botera-Ospina, 71 F.3d at 787. First testified that he was looking for defendant to commit a traffic violation as a basis to initiate a traffic stop, but this does not detract from his credibility. In fact, First was forthcoming about this point and his responses to defense counsel's questioning on this issue added to his credibility as a witness. First's testimony that he observed defendant's vehicle drift halfway into another lane without using a turn signal is credible and this traffic violation permitted First to initiate a traffic stop of defendant's vehicle.

The Court must also consider whether the length of the traffic stop was reasonable under the second prong of Terry. An officer conducting a traffic stop may request a driver's license, vehicle registration, run a computer check, and issue a citation. See United States v. Zubia-Melendez, 263 F.3d 1155, 1161 (10th Cir. 2001). An officer may also "ask questions about the motorist's travel plans and authority to operate the vehicle" in addition to obtaining the relevant documentation. United States v. Alcaraz-Arellano, 441 F.3d 1252, 1258 (10th Cir. 2006). Such questioning does

7

not violate the Fourth Amendment as long as the questioning does not prolong the traffic stop. United States v. Villa, 589 F.3d 1334, 1339 (10th Cir. 2009); United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005).  Police must have reasonable suspicion that criminal activity is afoot to continue a traffic stop beyond the purpose of issuing a warning or citation for the traffic violation. United States v. Kopp, 45 F.3d 1450, 1453 (10th Cir. 1995).  Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity." Ornelas v. United States, 517 U.S. 690, 696 (1996) (internal quotation marks omitted).  An "inchoate and unparticularized suspicion or 'hunch' is insufficient" to establish reasonable suspicion.  United States v. Hall, 978 F.2d 616, 620 (10th Cir. 1992) (internal quotations and citations omitted). Reasonable suspicion "represents a minimum level of objective justification which is considerably less than proof of wrongdoing by a preponderance of the evidence." Alcaraz-Arellano, 441 F.3d at 1260 (quoting United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997)).  In determining whether an officer had reasonable suspicion of criminal activity, the Court does not evaluate the facts in isolation but instead construes them together based on the totality of the circumstances. United States v. Arvizu, 534 U.S. 266, 274 (2002).

The government argues that a combination of factors was present that justified First's decision to continue the traffic stop and call a drug dog.  First testified that both men appeared nervous when he approached the vehicle and did not even notice that First was standing there for a period of time.  The passenger side window was partially rolled down and First detected a strong odor of perfume or air freshener.  First asked Ayala for his driver's license and proof of insurance, but Ayala could not produce a driver's license or proof of insurance.  Ayala also could not clearly identify who owned the vehicle.  After asking Ayala to wait in the patrol car, First had a short

8

conversation with Montoya while First checked the vehicle's NADAR sticker.  Montoya stated that he was visiting a friend in Tulsa, but he could not remember the friend's name.  Montoya also identified the owner of the vehicle as "Isabero," while Ayala told First that "Melissa" owned the vehicle.  First saw a Nebraska identification card on the floorboard.  First returned to his patrol car and asked Ayala about the purpose of his visit to Tulsa.  Ayala stated that he was in Tulsa looking for a job as a house painter, but First did not see any house painting equipment in the vehicle.  First also asked Ayala about the Nebraska identification card, but Ayala could not explain why an identification card for "Carlos Lopez" was on the floorboard of the vehicle.  First testified that this part of the traffic stop took about five to six minutes.

First testified that a combination of factors led him to conclude that he had reasonable suspicion to continue the traffic stop and call for a drug dog.  These factors include the nervous behavior of the driver and passenger, the use of perfume or air fresheners as a possible masking scent, inconsistent stories about Ayala's and Montoya's purpose for being in Tulsa, the presence of an unexplained identification card, and the occupants' confusion about ownership of the vehicle.  None of these factors standing alone would constitute reasonable suspicion but, taken together, give rise to a reasonable, articulable suspicion that criminal activity was afoot.  First testified that he relied on his training and experience when considering whether certain factors, such as the presence of a masking odor, contributed to the existence of reasonable suspicion.  It was appropriate for First to "draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information that 'might well elude an untrained person.'"  Arvizu, 534 U.S. at 273.  First clearly recalled the details of the events leading up to his decision to call for a drug dog, and the Court finds that his testimony about these events is credible. The combination of factors

present in this case certainly rose to a "'minimal level of objective justification,' something more than an 'inchoate and unparticularized suspicion or hunch,'" and First had reasonable suspicion to continue the traffic stop for the purpose of calling for a drug dog.  United State v. Moore, 22 F.3d 241, 244 (10th Cir. 1994).

Defendant argues that the drug dog, Max, breached the interior of the vehicle before alerting to the presence of drugs, and the government has not clearly ruled out the possibility that police officers opened the driver side window of the vehicle before the dog sniff.  A dog sniff of the exterior of a vehicle does not implicate any privacy concerns under the Fourth Amendment, and no showing of reasonable suspicion or probable cause is required before police use a drug dog to conduct an exterior sniff of a vehicle.  Illinois v. Caballes, 543 U.S. 405 (2005).  A canine alert that drugs are present constitutes probable cause permitting police to search a vehicle for illegal drugs. United States v. Williams, 403 F.3d 1203, 1207 (10th Cir. 2005); United States v. Rosborough, 366 F.3d 1145, 1152 (10th Cir. 2004).  If a drug dog breaches the interior of the vehicle during a sniff, this does not violate the Fourth Amendment if the dog acted instinctually and entered the vehicle due to the an act of an occupant, rather than the police officer.  United States v. Vasquez, 555 F.3d 923, 930 (10th Cir. 2009) (drug dog leapt into open passenger side window of vehicle, but this did not violate the Fourth Amendment because the dog's act was instinctual and the defendant left the window down).

Johnson testified that Max did stick his nose into the driver side window of the vehicle during the third walk around the vehicle, and the driver side window was completely open.  Max alerted about 15 to 25 seconds later on the opposite side of the vehicle.  The mere fact that Max's nose may have entered the vehicle does not constitute a Fourth Amendment violation, unless

10

defendant can show that police took some action to cause or facilitate the drug dog's entry into the vehicle.  See United States v. Winningham, 140 F.3d 1328, 1331 (10th Cir. 1998).  First testified that it was raining or drizzling that night, although Johnson did not recall that it was raining at the time of the dog sniff.  Defendant argues that is was unlikely that he would have been driving the window down if it was raining.  First testified that he approached the vehicle from the passenger side, and defendant argues that he did not need to roll down the driver side window to speak with First.  There is no evidence that Johnson rolled the window down before starting the dog sniff, and First's testimony does not address this issue.  First testified that he opened the driver side door to check the vehicle's NADAR sticker, but he did not testify that he rolled down the driver side window.  Defendant argues that the government can not carry its burden to show that a constitutional violation did not occur if the government fails to explain how the window was rolled down. However, the Court will not presume that constitutional error occurred merely because there is no evidence on a particular factual issue.  The government has established that First had reasonable suspicion to initiate a traffic stop and extend the traffic stop for a dog sniff.  There is no dispute that Max stuck his nose or snout into the driver side window, but this is not a constitutional violation unless the police engaged in some conduct that facilitated Max's partial entry into the vehicle. Without some evidence that police rolled down the driver side window, the Court will not presume that a constitutional violation occurred.

Even if the Court were to assume that police rolled the driver side window down or directed defendant to roll the window down, the Court finds that this act did not cause Max to alert and was harmless.  Max did stick his nose in the driver side window, but Max did not alert at that time. Instead, Max initiated a clockwise walk around the vehicle and focused on a seatbelt sticking out

11

of the passenger side door.  This occurred about 15 to 25 seconds after Max stuck his nose into the

driver side window of the vehicle, and there is no evidence that Max alerted because of his slight

entry into the driver side window.  Instead, Johnson's testimony shows that Max initially focused

on a seatbelt sticking out of the passenger side door and Max returned to this location to alert

Johnson to the presence of drugs in the vehicle.  Thus, there is no evidence that Max alerted because

the driver side window was rolled down and the Court will not suppress evidence for this reason.

**IT IS THEREFORE ORDERED** that defendant's Motion to Suppress Evidence (Dkt. #

225) is **denied**.

**DATED** this 18th day of June, 2010.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT